UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
'S OFFICE

2005 SEP -5  P 5: 18

UNITED STATES OF AMERICA    )
                            )    Criminal No. 04-30001-MAP
                            )
                            )
        v.                  )
                            )
RAYMOND SHAVER,             )
        Defendant.          )

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
TO WITHDRAW GUILTY PLEA

The United States of America, by and through its undersigned
attorneys, submits the Government's Response to Defendant's
Motion to Withdraw Guilty Plea.

I.    Background

The defendant was charged in a six count Indictment with
possessing with intent to distribute fifty grams or more of
cocaine base on the following dates:  June 25, 2003 (Count One),
August 1, 2003 (Count Three), August 28, 2003 (Count Four), and
September 26, 2003 (Count Five).  He was also charged with
conspiring to possess with intent to distribute fifty grams or
more of cocaine base between June of 2003 and January 13, 2004,
(Count Six).  Finally he was charged with possessing with intent
to distribute cocaine on July 17, 2003 (Count Two).  The
government filed an Information pursuant to 21 U.S.C. § 851
indicating it would rely upon the defendant's eight previous drug
distribution convictions at sentencing.

1

The defendant pled guilty to possessing with intent to distribute or distributing a total of 518.0 grams of cocaine base in the form of crack cocaine (98.4 grams of cocaine base in the form of crack cocaine, Count One; 98.8 grams of cocaine base in the form of crack cocaine, Count Three; 99.2 grams of cocaine base in the form of crack cocaine, Count Four; and 98.5 grams of cocaine base in the form of crack cocaine, Count Five), and 123.8 grams of cocaine (Count Two). The government proffered at the change of plea hearing that the government's witnesses at trial would have testified that, based upon their training and experience in investigating narcotics cases, the substance in Counts One, Three, Four, Five and Six was crack cocaine.

As set forth in the PSR, the defendant's conviction on Counts One, Three, Four, Five and Six combined with the filing of the § 851 Information results in a mandatory statutory sentence of life. Further, pursuant to U.S.S.G. § 5G1.1(b) the defendant's guideline sentence is also life.[1]

The defendant plead guilty on the first day of trial and there was no plea agreement in this case. The defendant now

---

[1]"Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence." § 5G1.1(b). Because the defendant has previously been convicted of seven drug distribution felonies and a violent felony, his sentencing guideline range as a Career Offender, with a three level reduction for acceptance of responsibility would have been OL 34, CHC VI with a range of 262 months to 327 months.

2

seeks to withdraw his guilty plea.  For the following reasons,
the defendant's motion should be denied.

II.  Argument

The defendant seeks to withdraw his guilty plea because, he
now says, "[t]o the best of my knowledge and belief, the form of
cocaine base that I was charged with distributing was not crack -
it was cocaine base.  Had I known that there was a difference
between cocaine base and crack, I would not have admitted that
the substance involved in my offense was crack rather than
cocaine base."  Defendant's Affidavit at 2-3.  The defendant does
acknowledge that at his Rule 11 hearing he "admitted to dealing
crack cocaine because I was admitting to what I was charged with
in the indictment."  Id. at 2.  Further, he acknowledges that "my
attorney, the Assistant United States Attorney and this Court all
told me that my plea could lead to life imprisonment."  Id.  The
defendant cites no cases in support of his argument.

The core concerns of Rule 11 are to ensure that a defendant
is accurately appraised of the charges against him, and that he
sufficiently understands them.  If the Court fails to satisfy
these concerns, the guilty plea may be vacated.  However, in this
case there was no error by the Court in the Rule 11 colloquy, and
since the defendant was sufficiently informed of the charges
against him, his guilty plea should not be vacated.  See United
States v. Ribas-Dominicci, 50 F.3d. 76, 78 (1st Cir. 1995).

3

Furthermore, any possible technical violation of Rule 11 is not
sufficient to uphold a challenge.  Id. at 78. ("[T]echnical
violations of Rule 11 do not count.").  In this case, because
there were no violations of Rule 11, the guilty plea entered by
the defendant should be upheld.

In determining whether to allow a plea to be set aside, a
court considers a number of factors:

> In deciding whether an asserted reason for
> withdrawal meets the Rule 32(e) standard, the
> district court must look to the totality of
> the circumstances, paying special attention
> to whether the plea was knowing, voluntary,
> and intelligent under Rule 11... The inquiry
> is essentially open-ended, however.  We have
> often recognized several other factors that
> may enter the decisional calculus of the
> trial court. These include the force of the
> defendant's proffered reason [for
> withdrawal]; the timing of the request; [and]
> the defendant's assertion of legal innocence
> (or the lack of such an assertion)... The
> court may also consider whether there has
> been a plea agreement....If the defendant
> shows sufficient reason for withdrawing the
> plea, the court must also consider any
> possible prejudice to the government.

United States v. Alvarez-Del Prado, 222 F.3d 12, 15 (1st Cir.
2000)(internal citations and quotation marks omitted).

When the defendant's plea withdrawal claim is based on a
claim that the plea lacks a factual basis in that the government
failed to recite necessary details at the plea colloquy, this
Court's focus is on whether the defendant's plea was voluntary
and whether his substantial rights were affected by the omission,

4

not whether the government proved him guilty beyond a reasonable
doubt at the time of the plea colloquy.  <u>United States v. Japa</u>,
994 F.2d 899, 904 (1ˢᵗ Cir. 1993).  In assessing prejudice, the
Court has wide range in what it may consider and may look, for
example, at the government's statements at the plea hearing, the
uncontested facts set out in the PSR, and other proceedings in
the case.  *See, e.g.*, <u>United States v. Zorrilla</u>, 982 F.2d 28 (1ˢᵗ
Cir. 1992); <u>United States v. Field</u>, 39 F.3d 15, 17 (1ˢᵗ Cir.
1994).

The defendant's understanding of the charges pursuant to
FRCP 11(c) is a core concern of Rule 11.[2]  <u>United States v.</u>
<u>Cotal-Crespo</u>, 47 F.3d 1, 4 (1ˢᵗ Cir. 1995).  A total failure to
address a Rule 11 "core concern" mandates that the guilty plea be
set aside.  <u>Id</u>.  In the absence of such a "total failure," the
question to be determined is whether any deficiency in the Rule
11 hearing affected the defendant's "substantial rights."  <u>Id</u>.
The First Circuit has said:

> In determining whether there has been a
> core violation, we review the totality of the

_____

[2]Rule 11(c) states in pertinent part:

> Advice to the Defendant.  Before accepting a
> plea of guilty ..., the court must address
> the defendant personally in open court and
> inform the defendant of, and determine that
> the defendant understands, the following:
>
> (1)  the nature of the charge to which
> the plea is offered...

5

> circumstances surrounding the Rule 11
> hearing, rather than apply a 'talismanic
> test.'  What is critical is the substance of
> what was communicated by the trial court, and
> what should reasonably have been understood
> by the defendant, rather than the form of the
> communication.  At a minimum, Rule 11
> requires that the trial court address the
> defendant personally in open court to
> ascertain that his plea is 'voluntary and
> intelligent.'

> In the absence of a total failure to
> address one of  Rule 11's core concerns, the
> question is whether irregularities in the
> plea-taking proceeding affected the
> defendant's 'substantial rights.'

Cotal-Crespo, 47 F.3d at 4-5 (internal citations omitted). This

Court has also observed that:

> The manner in which the charge is
> explained and the method for determining the
> defendant's understanding necessarily vary
> from case to case depending upon the capacity
> of the defendant and the attendant
> circumstances.  In making that determination,
> the court should not exalt form over
> substance but should look to the reality of
> the situation as opposed to the ritual.

United States v. Allard, 926 F.2d 1237, 1245 (1st Cir. 1991)

(internal citations omitted).

In this case, the Court read the six counts of the

indictment to the defendant during the Rule 11 hearing.  Tr. at

17-20.  The Court asked the defendant if he was pleading guilty

because he was in fact guilty of the crime charged in the

indictment, and the defendant admitted that he in fact did commit

the offenses charged.  Id.  Further, the government read a

6

detailed statement of the facts, including the fact that each of
the relevant counts involved cocaine base in the form of crack
cocaine, which was sufficient to cover the elements of the
offenses and the defendant's participation in the offenses.    Tr.
at 30-42.

    These facts demonstrate that the defendant understood the
charges.    The First Circuit has held that "where the prosecutor's
statement ... of the facts sets forth all elements of the offense
and the conduct of the defendant that constitutes the offense,
'the defendant's admission that the allegations are true is
sufficient evidence that he understands the charge.'"    Cotal-
Crespo, 47 F.3d at 6; Alvarez-Del Prado, 222 F.3d at 15; Allard,
926 F.2d at 1245 ("simply reading an indictment or information to
a defendant may satisfy the requirements of Rule 11 if the
charging document clearly describes the offense" ... "that is
particularly so when the offense is not complex and the defendant
is ... relatively sophisticated").    Although the defendant
contends that the crime is not self-explanatory, this is only
because - months after his guilty plea -- he has constructed a
highly technical argument concerning the nature of the substance
distributed.    Given the thorough and complete nature of the Rule
11 proceedings, together with the relatively simple nature of the
charged offenses, the defendant's guilty plea must be found to be
knowing and voluntarily.    McCarthy v. United States, 394 U.S. 459

(1969).

The defendant admits that he distributed over 50 grams of
cocaine base on four separate dates. That is all that is
required pursuant to 21 U.S.C. §§ 841(b)(1)(A)(iii) and 851 to
invoke the mandatory life sentence. He contests that the cocaine
base was in the form of crack cocaine. This Court clearly asked
the defendant and his attorney whether the cocaine base was in
the form of crack cocaine and received affirmative responses.
This Court is permitted to find that the cocaine base was in the
form of crack cocaine because judicial fact-finding triggering a
statutory mandatory minimum does not implicate the Sixth
Amendment. Harris v. United States, 536 U.S. 545, 558-60 (2002);
cf. United States v. Goodine, 326 F.3d 26, 32 (1st Cir. 2003),
cert. denied, 541 U.S. 902 (2004) ("drug quantity is not an
element of §841" and "a judge's determination of drug quantity
can influence the mandatory minimum sentence imposed"). Thus,
even if the term "cocaine base" in §841 means crack, nothing in
the law required the defendant to acknowledge that he distributed
crack cocaine at the time of his plea (or required to the
indictment to use the term "crack," rather than the term "cocaine
base"). As long as this Court finds that the defendant
distributed over 50 grams of cocaine base in the form of crack
cocaine on the four relevant dates, these judicial findings
required application of the mandatory life sentence on Counts

8

One, Three, Four, Five and Six.

However, the Court need not reach this issue because in this case the defendant clearly pled guilty to distributing and possessing with intent to distribute cocaine base in the form of crack cocaine. During the change of plea, regarding Count One the Court stated "the government says that you did knowingly and intentionally distribute and you did possess with the intent to distribute an amount of more than 50 grams of a substance containing cocaine base, also sometimes known as crack cocaine. Are you pleading guilty because you did in fact commit that crime?" The defendant responded "Yes, I did, your Honor." The Court then said "I want to make sure that it's clear on the record that the form of cocaine base that we're talking about is crack cocaine. That's what you were distributing that day, is that correct?" The defendant responded "Yes, I was, your Honor." The Court then inquired of defense counsel "Mr. Elliott, there's no dispute about that, am I correct?" Counsel for the defendant responded "There is none, Judge." Tr. at 17. The Court made virtually identical inquiries regarding Count Three [Tr. at 18]; Count Four [Tr. at 19]; and Count Five [Tr. at 19-20].

Further, the Court informed the defendant that he was almost certainly facing a statutory mandatory sentence of life in prison on numerous occasions during the hearing. Tr. at 8 ("I may very well when we come back here for sentencing a couple of months

9

from now, I may very well be in a position of having no choice at
all except to impose a mandatory life sentence on you"); Tr. at 9
(Even if I wanted to impose a sentence of less than a life
sentence, I have to follow the law and the law will require me to
impose a sentence of life imprisonment on you."); Tr. at 14 (The
maximum potential penalty in this case - and I want to make sure
you understand I don't know yet what sentence I'm going to impose
on you so I'm only talking about a potential sentence, something
that's possible, not necessarily certain, but something that's
possible is that you'll be looking at a mandatory life sentence.
That means you'll be placed in prison and you'll never be
released."); Tr. at 22 (Do you understand that if I permit you to
plead guilty, all that will be left in your case will be the
imposition of a sentence, and that sentence is almost certainly
going to include at least a very lengthy period of imprisonment
and possibly even a life imprisonment.); Tr. at 26 (And you
understand that in this case that could possibly be a life
sentence?); and Tr. at 42-43 (I don't know, as I said before,
what sentence I'm going to impose on you, but I do want to make
sure that you understand in the federal system a life sentence
means life.   There isn't any parole that someone would become
eligible for.   It would be a life sentence, and it means that you
would be serving that sentence without any possibility of
parole.).

The defendant's statement that he did not distribute crack cocaine, but rather, some other unspecified form of cocaine base is not worthy of belief. Cocaine base comes in only a few forms and each looks and feels different. Cocaine base is primarily sold on the street in the form of crack cocaine which is "hard and rock-like."[3]  Robinson, 144 F.3d 104, 108.  It is also present in the leaf of the coca plant and can be extracted from the leaf of the coca plant in the form of a paste.  Id.  In at least one case cocaine base was in a liquid form.  United States v. Munoz-Realpe, 21 F.3d 375, 376 (11th Cir. 1994).  In another case cocaine base was transported in pellets.  United States v. Barbosa, 271 F.3d 438, 462 (3rd Cir. 2001).  Finally, cocaine base has been secreted within the fiberglass resin of a suitcase. United States v. Lopez-Gil, 965 F.2d 1124, 1125 (1st Cir. 1992).

On June 18, 2003 the defendant sold the undercover agent (UCA) 123.1 grams of crack cocaine and on June 25, 2003 sold him 98.4 grams of crack cocaine.  On July 17, 2003 the defendant and UCA negotiated another 125 gram crack deal.  After the deal the UCA realized that the defendant had sold him powder cocaine. Immediately after the deal the UCA called the defendant and complained that he did not get crack cocaine.  The relevant portions of the conversation were as follows:

---

[3]Powdered cocaine is cooked in water with a commonly occurring base such as baking soda to make crack cocaine. Robinson, 144 F.3d 108.

11

Eldon Wallen:            Yeah man, well, that ah that stuff was a
                         little fucked up bro.

Raymond Shaver:          What's wrong with it?

Eldon Wallen:            It's ah, I was looking for rock man.  I
                         gotta cook that shit up.  I gotta have
                         somebody cook that shit for me and I'm
                         going to lose half of it.  I thought it
                         was going to be rocked up baby.

Raymond Shaver:          Oh.

Eldon Wallen:            In a rush to get out of there so quick
                         that uh you know other people flying
                         around, thought it was already rocked
                         up.  I saw those little rocks that were
                         in there, but you know the rest of it's
                         all powdered up and uh and uh like.

Raymond Shaver:          Yeah, but its good though.

Eldon Wallen:            Yeah, but man I gotta cook it up.  I'm,
                         I'm trying to make a buck here now I got
                         to pay somebody to take care of that
                         shit for me.  You know what I'm saying?

Raymond Shaver:          Oh, alright.  I, I'll catch you later on
                         the come-around man.

     In anticipation of another deal, on July 29, 2003, the UCA

called the defendant and said

Eldon Wallen:            Yeah, well I've been tied up.  You know
                         that shit that I uh got last time.  That
                         was a little fucked up.  My guy had to
                         try to work with it. I lost a little
                         money.  But I'm gonna be rollin into
                         town by uh, like I think on Friday.

Raymond Shaver:          Oh, Ok.

Eldon Wallen:            So, I'm lookin' for the, you know, the
                         hard stuff.  Alright?

Raymond Shaver:          Alright.

Eldon Wallen:     So, you'll hook me up?

Raymond Shaver:    Yeah, yeah, I'll make it right.

  Two days later during the August 1, 2003 deal in which the defendant sold the UCA 98.8 grams of crack cocaine the following conversation occurred

Eldon Wallen:     But I gotta have that, it's gotta be hard you know, that shit last time man, that fucked me all up.

Raymond Shaver:    What was wrong with it?

Eldon Wallen:     Well, I had to get one of my boys to try to work with it. He wasn't all, you know, he wasn't all that.

Raymond Shaver:    Wasn't all that great.

Eldon Wallen:     Yeah, you know. He's one of them chemist dudes, and he wasn't all that.

Raymond Shaver:    Huh.

Eldon Wallen:     Yeah, he don't really know what he's doin. Know what I mean? So that shit is sort of fucked up but, I gotta, that, this works for me, it works for me this way.

Raymond Shaver:    Um hum.

Eldon Wallen:     You take care of me, I'm a take care of you.

Raymond Shaver:    Alright.

       . . .

Eldon Wallen:     So, what'd you bring me this time?

Raymond Shaver:    I, I got like a hundred of hard man.

Eldon Wallen:     Ok.

13

Raymond Shaver:     That's what I got for you.

Eldon Wallen:       Well what are you lookin for the hundred
                    hard.  Come on bro, come on.

Raymond Shaver:     Man.

Eldon Wallen:       Come on bro, take care of me, come on,
                    you're at the plate right now, you know?
                    You can put one out of the ballpark.

Raymond Shaver:     (Sighs)

Eldon Wallen:       Well, man don't hit my car.

Raymond Shaver:     (Unintelligible)

Eldon Wallen:       Shit.  What are you gonna do?  Come on.

Raymond Shaver:     Oh shit.  Give me um, three, man.

Eldon Wallen:       Three.  Wait, let me check me out bro.

Raymond Shaver:     (Unintelligible) you ain't gonna be
                    disappointed.  (Unintelligible)

Eldon Wallen:       And ah, you talkin ah, you still gotta
                    get that, that, that three?  You still
                    gotta square that away.  I mean we, we
                    ain't letting that rock and roll.

Raymond Shaver:     Sh, I'll have to pay for that shit man.

Eldon Wallen:       Huh.

Raymond Shaver:     I have to pay for that shit man, you
                    know what I mean?

Eldon Wallen:       Yeah.

Raymond Shaver:     When I don't get results, it don't go on
                    somebody else, it go on me.

Eldon Wallen:       Alright dog, I hear ya, I hear ya.  Hey,
                    ah, you know (unintelligible) only the
                    poor man always crying.  Hold on to
                    that, that's for you.  That's a little
                    present.  Don't say I never gave you

                              14

nothin.

| | |
|---|---|
| Raymond Shaver: | What is it? (Unintelligible) |
| Eldon Wallen: | It's a bag (unintelligible) (pause) (unintelligible) got to take care of me, man. |
| Raymond Shaver: | Let me know when you're comin down ahead of time. Give me some type of idea what you need to be wantin and I'll have it for you. |
| Eldon Wallen: | Yeah, well what, what are you talkin about, that you can hook me up with though man. |
| Raymond Shaver: | Whatever. |
| Eldon Wallen: | Really, well what could you put on the plate. I could come up with some money, I could work with the money. I got some people that ah, look out for me, so you know. What, what are you talking about. |
| Raymond Shaver: | (Unintelligible) buyin. |
| Eldon Wallen: | Yep. That and, and the (unintelligible) I went (unintelligible). |
| Raymond Shaver: | (Unintelligible) man. |
| Eldon Wallen: | What do you mean (unintelligible). |
| Raymond Shaver: | (Unintelligible) |
| Eldon Wallen: | So, I mean, what can you say (unintelligible) right there. |
| Raymond Shaver: | I don't know. I could, I could look for some shit. |
| Eldon Wallen: | Yeah. |
| Raymond Shaver: | (Unintelligible) |
| Eldon Wallen: | Three fifty, four of hard. |

| | |
|---|---|
| Raymond Shaver: | Oh yeah, no problem, that's nothin. |
| Eldon Wallen: | I just thought, alright. |
| Raymond Shaver: | I can get you that. |
| Eldon Wallen: | Alright.  Alright.  I'll talk to you. |
| Raymond Shaver: | Talk to me, that's when you gotta let me know. |
| Eldon Wallen: | I will, I'll call you ahead of time. |
| Raymond Shaver: | Ahead of time. |
| Eldon Wallen: | Yeah, I will. |
| Raymond Shaver: | I sell a lot of "P" too, so I don't cook up like two fifty of hard. |
| Eldon Wallen: | Right. |
| Raymond Shaver: | And I have four or five hundred in "P" cause a lot of niggas down here. |
| Eldon Wallen: | Right. |
| Raymond Shaver: | They like their shit. |
| Eldon Wallen: | Ok. |
| Raymond Shaver: | In P. |
| Eldon Wallen: | Ok, yeah, right. |
| Raymond Shaver: | You know what I'm sayin.  So I hold a lot of "P" man. |
| Eldon Wallen: | Ok. |

The defendant's own tape recorded words, spoken at a time when he did not know he was being recorded, belie his assertion that he did not distribute crack, but rather some other form of cocaine base.  Given that the defendant and UCA frequently spoke

16

of "rock" and "hard"; that the cocaine powder "P" had to be "cooked up," the defendant was certainly not selling leafs, a paste, a liquid or suitcases. In fact, he knew at the time that he was selling the UCA crack cocaine.

III. Conclusion

Therefore, the defendant's Motion to Withdraw Guilty Plea should denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney,

By: _____
TODD E. NEWHOUSE
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

Hampden,    ss.                    Springfield, Massachusetts
                                   September 6, 2005

I, Todd E. Newhouse, Assistant U.S. Attorney, do hereby certify that I have served a copy of the foregoing, via mail to all counsel of record.

_____
TODD E. NEWHOUSE
Assistant U.S. Attorney